RALPH L. REID, ADMINISTRATOR OF THE ESTATE OF DOROTHY VIRGINIA REID, v. CITY COACH COMPANY, INC., A CORPORATION.

(Filed 3 May, 1939.)

**1. Trial § 22b—**

On motion to nonsuit, the evidence which makes for plaintiff's claim or tends to support his cause of action is to be considered in its most favorable light for plaintiff, and he is entitled to every reasonable intendment thereon and every reasonable inference therefrom.

**2. Automobiles § 18g—Evidence of negligent operation of bus in residential district resulting in injury to four-year-old child held for jury.**

The evidence tended to show that the highway at the scene of the accident was built up on both sides, for about 300 feet, with residences and buildings, including a post office, church and several stores, that a large number of children were leaving the church from a Sunday school Christmas Eve party, and that defendant's bus, running at a speed estimated by a witness at from 40 to 50 miles an hour, struck and fatally injured plaintiff's intestate, a child four and one-half years old, and that the wheel of the bus skidded on the shoulder of the highway 133 feet before it stopped with intestate lying in front of the rear wheel. *Held:* The evidence was plenary to be submitted to the jury on the question of the negligent operation of the bus.

**3. Negligence § 11—In action for wrongful death of minor, contributory negligence of parents is a defense.**

In an action to recover for the wrongful death of a child, whether brought by one of its parents as administrator or not, the negligence of either or both of the parents will constitute contributory negligence barring recovery, since the parents would be the beneficiaries of any recovery as heirs of the child, and the law will not permit a person to benefit by his own tort.

**4. Same—Evidence held not to show contributory negligence on the part of parents.**

This action was instituted by the father of a four-and-one-half-year-old child as administrator to recover for the wrongful death of the child. The evidence tended to show that the father consented to the child's attending a Sunday school Christmas Eve party two blocks away, in company with the child's ten-year-old sister, who had unusual presence of mind and sense of responsibility, and that in going to the church the children had to cross a railroad track and a public highway, and that the fatal accident occurred as the children were returning from the entertainment when intestate ran onto the highway before her sister could stop her, and was hit by defendant's bus, which was traveling at an excessive speed. *Held:* The evidence does not show contributory negligence on the part of the father in permitting the four-and-one-half-year-old child to go two blocks from home to the Sunday school entertainment in company with her ten-year-old sister.

**5. Negligence § 12—**

A child four and one-half years old is legally incapable of negligence, primary or secondary.

REID v. COACH Co.

**6. Negligence § 21—**

The refusal of the trial court to submit an issue of contributory negligence in this action to recover for the wrongful death of a four-and-one-half-year-old child *is held* without error, there being no evidence of negligence on the part of the child's parents, and the child being incapable of contributory negligence.

**7. Automobiles § 12d—Instruction defining "residential district" held without error.**

A charge defining a "residential district" as being "the territory contiguous to a highway, not comprising a business district, when the frontage on the highway for a distance of 300 feet or more is mainly occupied by dwellings and buildings in use for business" *is held* without error, the definition of a residential district in chapter 148, Public Laws 1927, Art. 1, sec. (s), not having been repealed by Public Laws of 1937, chapter 407, sec. 2 (a), since sec. 145 of the later act repeals only prior laws in conflict therewith.

**8. Automobiles §§ 12b, 12d—Instruction as to speed limit in residential district and requirement to slacken speed at special hazards held without error.**

This action was instituted to recover for the death of a four-and-one-half-year-old child who was struck by defendant's bus. The evidence tended to show that the injured child was one of a large number of children leaving a Sunday school entertainment. *Held:* The trial court's instruction correctly defining "residential district" and charging that the lawful speed therein was 25 miles an hour, but that this limitation did not relieve the driver from further reducing his speed if made necessary by special hazards in order to avoid colliding with any person or vehicle, is without error, whether the scene of the accident was in a "residential district" as defined by statute and the conflicting evidence as to the speed of the bus, being left to the determination of the jury.

**9. Statutes § 10—**

Repeals by implication are not favored.

APPEAL by defendant from *Hamilton, Special Judge,* and a jury, at December Term, 1938, of GASTON. No error.

This is an action for actionable negligence brought by plaintiff, administrator of the estate of Dorothy Virginia Reid, against the defendant City Coach Company, Inc., to recover damages for the death of his intestate.

The evidence is to the effect that on 24 December, 1937, Christmas Eve, about 3:00 p.m., plaintiff's intestate, Dorothy Virginia Reid, was struck and seriously injured by a bus belonging to the defendant company and being driven by Robert Carpenter, and died the following Thursday. Near the scene of the injury is Flint Grove Baptist Church, which Ralph L. Reid and his family attended. It is located on the south side of the street from the main highway on which the injury occurred. His children attended the Sunday school. On Christmas

Eve a party or "treat" was given for the children of the Sunday school. Helen Reid, ten years of age, took her little sister, Dorothy Virginia Reid, four and a half years old, with Thelma Ballard, five years old, to the Sunday school entertainment. The father gave his consent for them to go. He lived two blocks off and away from and on the north side of the church and highway. In going to the church the children had to cross the P. & N. Railroad and the State Highway No. 7, on which the injury occurred. The mother was at home. She usually went with the children to Sunday school, but this time they went alone.

Ralph L. Reid testified, in part: "In that settlement there is the church and a good many houses, people live all the way down the road for about a half mile this side and I don't know just how far on the side toward Lowell. The section is called East Gastonia—we have a post office that is about one hundred and fifty yards from the scene of the accident. There are five mills out there, two stores, a barber shop and a church—four or five hundred people attend the church. . . . The Court: What he is asking you is: What is there bordering on the highway—whether houses, residences or places of business? Ans.: Most of them is homes of people who work in the mill except the church, the barber shop and the post office. *It is thickly built all up and down the road.* There is a church on a side street entering the highway near where the accident occurred—I don't know the name of the street, but the church is about fifty feet, maybe a hundred, from the highway, and fronts on the side street."

Robert Carpenter was employed by the defendant and was operating the bus which was going from Cramerton to Gastonia, through Lowell and McAdensville, and picked up passengers along the way. After the Christmas party, where the children received presents, Helen Reid and her sister, Dorothy, left the church to go home the way they had come. Thelma Ballard was with them. They reached the State Highway, which was 18 feet hard-surfaced in the center with four to six feet dirt shoulders on each side and a ditch where the water drained off the road.

Helen Reid testified, in part: "We were crossing a ditch and got to the road and I lifted her across the ditch. We started down the road and went a little tiny piece and started crossing the road. We didn't get across. I went to take hold of her hand and she wouldn't let me. I caught her dress and she pulled away and I told her to run and she ran. I saw the bus coming around the curve. It was as far away as from here to that wall (indicating side wall of courthouse). I hollered to Dorothy. I don't know how fast the bus was coming. She just lacked about two more steps being across when the bus hit her. The bus ran on to the post and stopped. I went over to where she was. I saw her. She was kind of close to the back wheel. She had not been

moved. I was among the first ones to get there. She was on the right of the bus. She was the first one to get to the highway; the least children got to the highway first. *There were a lot of little ones going down the highway.* The least children left the church first. I am eleven years old. My mother is at home sick. She couldn't come to court. . . . When we got the treat me and Dorothy and Billy Ballard came to the highway and started toward Gastonia. Billy Ballard is five. We started toward Gastonia on the highway. I don't know how far from the barber shop. I tried to hold my little sister's hand and she jerked loose and I grabbed her dress and she pulled away and I hollered to her to run. I tried to keep her from crossing and she pulled away from me and went on."

L. F. Hefner testified, in part: "As the bus passed me, it seemed like it was running pretty fast—*that was before it struck the child*—something like fifty yards before. *To the best of my knowledge I'd say it was traveling 40 to 50 miles an hour.* I heard him hitting something and jumped out of my car and went down there and the little girl was laying there in the road about two feet on the hard surface and a little girl came running—the child's sister—and grabbed her right behind there and picked her up and I walked up to her and said, 'She is too heavy and she is hurt, too.' *And she sat down right in the road out on the dirt and pulled her up on her lap and sat there and held her.*"

Fred Ware testified, in part: *"There were a good many people on the highway and on the side.* I noticed the kids who got the 'treat.' They all know me as 'Fred' and came by and showed it to me. That was about five minutes before the wreck happened. Two hundred or more children attended the party. Some of them went back of the church, but those who lived down, up and across the highway would come down there to that point. Your Honor, I had to go about sixty feet to the accident. I'd say I was there in two minutes. There was just two fellows there. The driver was just stepping out of the cab. The people crowded around so fast—I'd say there were a hundred or more there. The bus stopped against the curb where they put rock on there at a telephone pole—it knocked the telephone pole down. We measured where the bus went and it was 133 feet from where the bus started sliding until it hit the post. We got a tape measure and measured it on the marks on the road where it slid. *It started to slide and went to the right—it slid practically all of the 133 feet on the dirt shoulder.* When I got there I saw the child—she was laying about middle ways of the bus right up on the rocks. I don't think the bus had been moved. *The other little girl had her head in her lap.* That is about all I know."

Clarence Rogers testified, in part: "I don't know exactly the number of people live there. In the vicinity—counting both sides, and stores, there would be fifteen or twenty buildings. The road extends on beyond

the scene of the accident toward Lowell. It is built up about three hundred yards, roughly speaking. It is a mill village on both sides of the road—the houses are close together."

Craig Starnes testified, in part: "Nothing in the way of houses stopping or farms to show you are outside the city. (Witness is handed paper for identification.) On that map, the right-hand side of the road. is thicker settled than it is on the left going out toward Lowell. There are houses and stores and post office on the left going out and houses, stores and barber shop on the right going out. There are practically fifteen houses on the right and on the other side something like seven or eight. There are mills in that locality and community streets. *Whenever I got there the other little girl was sitting down and had her little sister's head on her lap."*

The issues submitted to the jury and their answers thereto were as follows:

"1. Was the plaintiff's intestate killed as a result of the negligence of the defendant, as alleged in the complaint? Answer: 'Yes.'

"2. What amount, if any, is the plaintiff entitled to recover of the defendant? Answer: '$8,000.' "

The court below rendered judgment on the verdict. The defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and other necessary facts will be set forth in the opinion.

*Jake F. Newell for plaintiff.*
*J. Laurence Jones and J. L. DeLaney for defendant.*

CLARKSON, J. At the close of plaintiff's evidence and at the close of all the evidence, the defendant in the court below made motions for judgment as in case of nonsuit. C. S., 567. The court below overruled these motions and in this we can see no error.

The evidence which makes for plaintiff's claim, or tends to support his cause of action, is to be taken in its most favorable light for the plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence, and every reasonable inference to be drawn therefrom.

The evidence as set forth above is plenary to have been submitted to the jury on the question of negligence. *Goss v. Williams,* 196 N. C., 213 (221-2); *Kelly v. Hunsucker,* 211 N. C., 153.

The court below was requested by defendant to submit the following issue: "Did plaintiff's intestate, by reason of the negligence of her parents, contribute to her injury and death, as alleged in the answer?" The court below denied the request and defendant excepted and assigned error, which cannot be sustained.

Helen Reid was at the time of the injury ten years old. She was given permission by her father to take her sister, Dorothy Virginia Reid, four and a half years old, to a Christmas Eve Sunday school entertainment to be held at the church, which was about two blocks from her home, on 24 December, 1937, some time before three o'clock p.m. We cannot see how the parents were negligent and contributed to the injury of Dorothy Virginia Reid, who was killed by the defendant. Her sister, Helen, who had her in charge, was ten years old. The defendant cites *Davis v. R. R.,* 136 N. C., 115, for its authority, which we do not think sustains its contentions.

In the *Davis case, supra,* it is said, at pp. 116-117: "The plaintiff, as administrator of his infant son, two and a half years old, who having wandered off without the knowledge of his parents was injured on the track of the defendant by its train so that the child died, and the plaintiff alleges this was the negligence of the defendant. . . . The real point in the case is in the refusal of the court to submit the issue of contributory negligence upon the ground that negligence would not be imputed to the infant. This is true in an action in behalf of an infant. *Bottoms v. R. R.,* 114 N. C., 699, 41 Am. St. Rep., 799, 25 L. R. A., 287; *Duvall v. R. R.,* 134 N. C., 331."

In the *Bottoms case, supra,* at p. 713, is the following: "These numerous authorities which we have thought proper to cite very abundantly sustain the position enunciated by the Supreme Court of the United States, and adopted by this Court in *Murray v. R. R.,* 93 N. C., 92, that in the law of negligence the degree of care and discretion required of an infant of tender years 'depends upon his age and knowledge,' and they also sustain the position that where the child is too young, as in this case, to exercise any discretion whatever, the negligence of his parent or other custodian in permitting him to escape and place himself in a perilous position will not be imputed to him so as to defeat his action for damages sustained by reason of the negligence of another."

In the *Davis case, supra* (pp. 117, *et seq.*): "The doctrine generally sustained is that of *Robinson v. Cone,* 22 Vt., 213, 54 Am. Dec., 67, known as the Vermont rule, and is followed by us in *Bottoms v. R. R., supra,* and which we deem still the proper rule. This latter rule has the weight of authority in judicial decisions, and standard law writers. That eminent text writer, Mr. Bishop (Non-Contract Law, sec. 482), criticising the New York rule, says: 'This new doctrine of imputed negligence, whereby the minor loses his suit, not only where he is negligent himself, but where his grandfather, grandmother or mother's maid is negligent, is as flatly in conflict with the established system of the common law as anything possible to be suggested. The law never took away a child's property because his father was poor or thriftless or a scoundrel, or because anybody who could be made to respond to a suit

REID *v.* COACH CO.

for damages was a negligent custodian of it.' . . . (p. 119). When, however, the parents are authorized, as in some states, to bring an action, their contributory negligence can then be pleaded. S. & R. Neg., sec. 71; *Williams v. R. R.,* 60 Tex., 205; *Westerberg v. R. R.,* 142 Pa. St., 471, 24 Am. St. Rep., 510, *provided the parent be actually in fault.* (Italics ours.) *Ibid.,* sec. 72. The same rule applies where the parent is suing as administrator but is also the beneficial plaintiff or the *cestui que trust* of the action as distributee of the child's estate. . . . (p. 120). The underlying principle in our view is that no one shall profit by his own wrong, and if the father's negligence, and not that of the railroad company, was the proximate cause of the death (under the doctrine of the 'last clear chance'), it would be obviously wrong to permit him to put money into his pocket for damages proximately caused by his own negligence, because sued for through an administrator (whether himself or another), yet for his benefit. In such cases the contributory negligence of the father is a defense just as is actions brought by the father for loss of services. 1 Fetter Carriers, sec. 199, pp. 534, 535; Beach, Contributory Negligence, sec. 31; Tiffany, Death by Wrongful Act, sec. 69; *Wolf v. R. R.,* 55 Ohio St., 530, 36 L. R. A., 812, . . . (p. 121). Of course, as in all other cases, the preliminary question to be decided is whether there was contributory negligence of one parent (or both), which was the proximate cause of the death, *i.e.,* whether the defendant had or not the 'last clear chance' to avoid killing the intestate."

The defendant in its brief says: "We do not think the lower court would have had any hesitancy in approaching this question along the lines argued by the appellant had it not been that *the ten-year-old sister was along with the child.* We do not think that this should change the rule."

That the ten-year-old sister was along with the child is the crux of the case. We cannot see how it can be held as contributory negligence for a father to allow a four-and-a-half-year-old child to go two blocks from home to attend a Christmas Eve entertainment, given by the Sunday school of which both children were members, in company with her ten-year-old sister.

Const. of N. C., Art. IX, sec. 2, in part, reads: "The General Assembly, at its first session under this Constitution, shall provide by taxation and otherwise for a general and uniform system of public schools, wherein tuition shall be free of charge to all children of the State *between the ages of six and twenty-one years,*" etc. N. C. Code 1935 (Michie), sec. 5383.

We cannot say that a parent was guilty of contributory negligence who allowed a child of 6 to 10 years of age to go to a Sunday school—a

REID *v.* COACH CO.

matter of all importance to the rising generation. It is a matter of common knowledge that a normal child ten years of age is fully competent to care for a child four and a half years of age. Her conduct at the time of the accident showed that her watchfulness never ceased. The pathos, "Whenever I got there the other little girl was sitting down and had her little sister's head in her lap."

In *Kelly v. Hunsucker,* 211 N. C., 153 (159), it is written: *"Varser, J.,* speaking for the Court in a well-considered opinion in *Campbell v. Laundry,* 190 N. C., 649 (651-652), citing a wealth of authorities, says: 'There must, of necessity, be a period within which a child is incapable of exercising care to such a degree as may be otherwise legally applicable to the given situation. We are of the opinion that a child four years old is incapable of negligence, primary or contributory. . . . This ruling is in accord with the decisions throughout the country, as indicated by the following: *McDermott v. Severe,* 202 U. S., 600. In this case the Court affirmed the judgment for plaintiff, a boy six years and 10 months old. The trial court instructed the jury that, since plaintiff was under seven years of age, contributory negligence could not be attributed to him.' "

The child four and a half years old was incapable of negligence, primary or contributory. In the *Kelly case, supra,* the child was four and a half years old. We see no error in the charge of the court below, as follows: "The court instructs you, gentlemen of the jury, that in this case, there is no issue of contributory negligence; that the child was of such tender years—four or four and one-half years of age—as presumed to be incapable of exercising that degree of care and caution which would impute to her or to him negligence. The only issue on that for you, gentlemen, to determine is whether or not there was negligence on the part of the defendant and whether that negligence proximately resulted in the injury from which the child died."

The court further charged the jury: "The plaintiff contends that the death of his intestate, Dorothy Virginia Reid, resulted from the negligence of the Coach Company in that the operator of one of its buses, as contended by the plaintiff, operated the bus through the residential district in a careless and negligent manner and that that carelessness on the part of the driver resulted in the death of his intestate, Dorothy Virginia Reid. The Legislature of North Carolina, in its wisdom and discretion in the interest of life and property, has seen fit to enact certain laws with respect to the operation of motor vehicles upon the public highways and thoroughfares of the State and in those enactments the Legislature has prescribed certain speed limits of operation and certain other conditions for the conduct and guidance of the operators of motor vehicles on the public highways. Among other things, the Legislature has pre-

scribed that no person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing. It has further provided or enacted that where no special hazard exists, the following speed shall be lawful: 20 miles per hour in business district, 25 miles per hour in any residential district, and 45 miles per hour on the main highways. The residential districts, gentlemen of the jury, has been defined by the Legislature as being the territory contiguous to a highway, not comprising a business district, when the frontage on such a highway for a distance of 300 feet or more is mainly occupied by dwellings or by dwellings and buildings in use for business. The Legislature further has said that the fact that the speed on a highway is lower than that prescribed shall not relieve the driver from the duty to decrease speed when approaching and crossing an intersection, when approaching and going around a curve, when approaching a hillcrest, when traveling upon narrow and winding roadways, and when special hazards exist with respect to pedestrians and other traffic, by reason of weather or highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle or conveyance upon or entering the highway. In compliance with legal requirements, it is the duty of all persons to use due care. Other enactments, of course, have been made by the Legislature, but the ones read to you are the principal ones controlling with respect to the matters and things in controversy and at issue in this cause. . . . Now, on that, gentlemen of the jury, the court instructs you that if you find from the evidence that the car was being operated at this point in a territory designated as a residential district under the definition read to you, as laid down by the court, then the lawful rate of speed for operating was 25 miles an hour. If you should not so find by the evidence—that is, if you should not so find that it was a residential district in the contemplation of the law and fixed and determined by the statutory definition given, nor that it was a business district where the speed limit is 20 miles an hour, then the court instructs you that the lawful rate of speed would have been 45 miles an hour."

The defendant excepted and assigned error to the above excerpts from the charge. From a careful review of the entire charge, the statutes and charge above quoted, we can see no prejudicial or reversible error from the facts in this case.

Public Laws of 1937, ch. 407, Art. X, sec. 103—speed restrictions (2) Twenty-five miles per hour in any residence district.

It was contended by plaintiff and not seriously controverted, that the child was killed in a residence district. The driver of the motor bus contended he was running 25 miles an hour within the law. On the other hand, the plaintiff's witnesses testified he was running 35, 40 and

50 miles per hour. These contentions were carefully left to the jury as questions of fact for them to determine under the law.

The defendant contends ch. 407, Public Laws of 1937, was intended and did cover the entire motor law on the subject. We cannot so hold. The repealing clause, sec. 145, says: "That all laws and clauses of laws in conflict with the provisions of this act or laws or clauses of laws providing otherwise for the subject matter of this act are hereby repealed." "Repeals by implication are not favored." *Kelly case, supra,* p. 156.

Chapter 148, Public Laws 1927, Art. I, sec. (s), defines "business district" as follows: The territory contiguous to a highway when fifty per cent or more of the frontage thereon for a distance of three hundred feet or more is occupied by buildings in use for business." "Residence District—The territory contiguous to a highway not comprising a business district when the frontage on such highway for a distance of three hundred feet or more is mainly occupied by dwellings or by dwellings and buildings in use for business."

Laws 1935, ch. 311, sec. (1), 20 miles per hour in any business district. (2) 25 miles per hour in any residence district.

Ch. 407, Public Laws 1937, sec. 2 (a): "Business District—The territory contiguous to a highway when fifty per cent or more of the frontage thereon for a distance of three hundred feet or more is mainly occupied by dwellings or by dwellings and buildings in use for business." It nowhere repeals or defines "Residence districts," as theretofore set forth in the statutes on the subject.

The evidence would indicate that after Helen Reid lifted her little sister, Dorothy Virginia Reid, across the ditch and started crossing the road, the child must have seen the bus swinging around the curve at a rapid rate of speed, and, being frightened, and to avoid being hit, she pulled away from her older sister and started running across the road. Her sister told her to run and she began running and lacked only some two steps from being across the road when the bus hit her.

According to plaintiff's evidence, the driver of defendant's bus was running through a "residence district" crowded with people coming from a Christmas Eve Sunday school entertainment, at about 3:00 o'clock p.m., at from 35 to 50 miles an hour, going around a curve in a thickly settled community. The speed is indicated by the fact that the bus skidded 133 feet. It struck the child, who died a few days later. The sister, Helen, 10 years of age, picked the wounded child up and tenderly held her little sister's head on her lap before any person reached the scene. This presence of mind and heroic conduct fully justified her father in allowing the ten-year-old child to take her sister to the Christmas Eve Sunday school "treat."

On the whole record we see no prejudicial or reversible error.

No error.